UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JENNA M. DiMARTILE; JUSTIN G. CRAWFORD;
PAMELLA GIGLIA; JOE DUROLEK; and
DAVID SHAMENDA,

                         Plaintiffs,

v.                                                                    1:20-CV-0859
                                                                      (GTS/CFH)

ANDREW M. CUOMO; LETITIA JAMES; MARK
POLONCARZ; EMPIRE STATE DEVELOPMENT
CORP.; and ERIE COUNTY DEPARTMENT OF
HEALTH,

                         Defendants.
_____

APPEARANCES:                                                OF COUNSEL:

RUPP BAASE PFALZGRAF & CUNNINGHAM LLC        R. ANTHONY RUPP, III, ESQ.
   Counsel for Plaintiffs                                    PHILLIP A. OSWALD, ESQ.
424 Main Street
1600 Liberty Building
Buffalo, NY 14202-3616

HON. LETITIA A. JAMES                                       ADRIENNE J. KERWIN, ESQ.
Attorney General for New York                               DENISE P. BUCKLEY, ESQ.
   Counsel for State Defendants                             Assistants Attorney General
The Capitol
Albany, NY 12224

HON. MICHAEL A. SIRAGUSA                                    MICHELLE PARKER, ESQ.
Erie County Attorney                                        First Assistant County Attorney
   Counsel for County Defendants
95 Franklin Street, Suite 1634
Buffalo, NY 14202

GLENN T. SUDDABY, Chief United States District Judge

<u>**DECISION and ORDER**</u>

Currently before the Court, in this civil rights action filed by Jenna M. DiMartile, Justin

G. Crawford, Pamella Giglia, Joe Durolek, and David Shamenda ("Plaintiffs") against Andrew

M. Cuomo, Letitia James, and Empire State Development Corporation ("State Defendants"), and

Mark Poloncarz and the Erie County Department of Health ("County Defendants"), is the State

Defendants' motion for a stay of the preliminary injunction granted by the Court on August 7,

2020, pending the State Defendants' appeal of that preliminary injunction.  (Dkt. No. 27.)  For

the reasons set forth below, the State Defendants' motion is denied.

**I.      RELEVANT BACKGROUND**

**A.      Procedural History**

On July 31, 2020, Plaintiffs filed a motion for a temporary restraining order and

preliminary injunction.  (Dkt. No. 4.)  On August 5, 2020, the County Defendants and the State

Defendants each filed cross-motions to dismiss Plaintiffs' Complaint.  (Dkt. Nos. 11, 14.)  On

August 7, 2020, the Court held a hearing on Plaintiffs' motion through video conference, and, on

the same day, granted Plaintiffs' motion for preliminary injunction and deferred consideration of

Defendants' cross-motions.  (Dkt. No. 20.)  On August 11, 2020, the State Defendants filed the

current motion seeking a stay of the preliminary injunction pending appeal to the Second Circuit.

(Dkt. No. 27.)  Although the County Defendants do not oppose the State Defendants' motion,

Plaintiffs do oppose it.  (Dkt. No. 27, Attach. 2, at 4; Dkt. No. 27, Attach. 2, at 7.)

**B.      Briefing on the State Defendants' Motion**

**1.      State Defendants' Memorandum of Law**

Generally, in their motion, the State Defendants argue that the Court should issue a stay

of its preliminary injunction for four reasons: (1) they have shown a probability of success on the

merits because (a) weddings are not equivalent to ordinary dining, (b) there is no evidence or

reasonable basis for assuming that patrons at the weddings will follow social distancing

protocols and other state-mandated health and safety protocols, and (c) the Court did not apply

the heightened standard applicable to preliminary injunctions that, as here, essentially grant

Plaintiffs all the relief they are seeking; (2) there is a high danger of irreparable injury to the

State Defendants in that allowing weddings to take place with more than 50 individuals in

attendance will likely result in a resurgence of COVID-19 infections; (3) a stay would not

substantially injure Plaintiffs because they would still be permitted to get married and have

weddings at their chosen venue within the 50-person limit and may use other avenues such as

videoconferencing, rescheduling, or having separate gatherings elsewhere for excess guests; and

(4) the public interest strongly favors a stay due to the risks of the spread of COVID-19.  (Dkt.

No. 27, Attach. 6 [State Defs.' Mem. of Law].)

### 2. Plaintiffs' Opposition Memorandum of Law and Cross-Motion for Sanctions

Generally, in opposition to the State Defendants' motion, Plaintiffs make three

arguments.  (Dkt. No. 31, Attach. 5, at 5-22 [Pls.' Opp'n Mem. of Law].)  First, Plaintiffs argue

that a request for a stay of a preliminary injunction is logically inconsistent with the granting of a

preliminary injunction under Second Circuit law because, in granting the preliminary injunction,

the Court found that Plaintiffs would be irreparably harmed in the absence of an injunction, and

thus the State Defendants cannot make the requisite showing that Plaintiffs would not be harmed

if a stay was granted.  (*Id.* at 5-8.)

Second, Plaintiffs argue that the Court should not consider the declaration from Dr.

Zucker because the State Defendants did not submit that evidence as part of their response to the

motion for preliminary injunction and they should not be permitted to effectively have a second

chance at litigating issues already decided by this Court.  (*Id*. at 8-9.)  In the alternative, Plaintiffs argue that Dr. Zucker's declaration does not indicate that the Court's findings were somehow erroneous.  (*Id.*)

Third, Plaintiffs argue that the State Defendants have failed to show that a stay is warranted for the following reasons: (a) the State Defendants are not likely to prevail on the merits because (i) the standard on appeal is highly deferential to the district court, (ii) the Court has already considered and rejected the substantive grounds the State Defendants raise here, (iii) whether guests are likely to comply with social distancing and other safety protocols is not even a factor in the relevant equal protection analysis, and the State Defendants' arguments further compound their failure to treat weddings and wedding guests as equal with other persons who are trusted to comply with the relevant protocols when engaging in activities like dining at restaurants, and (iv) the evidence submitted by Plaintiffs shows that weddings are actually safer than ordinary restaurant dining and other activities that have been allowed at capacities of more than 50 people; (b) the Court properly found a substantial likelihood of success and a strong showing of irreparable harm because, although it did not conform to certain specific language throughout its decision, its analysis makes clear that it found that Plaintiffs made a strong affirmative showing of a violation of a constitutional right; (c) the State Defendants have not shown that they will be irreparably harmed absent a stay because they point only to a possibility that the wedding could result in the spread of COVID-19, which is by its nature speculative; (d) Plaintiffs would be substantially harmed by a stay of the preliminary injunction based on the Court's previous finding of irreparable harm that merited granting the preliminary injunction; and (e) the public interest would not be served by a stay because the public interest is served by protecting constitutional rights.  (*Id.* at 10-22.)

Plaintiffs also argue that Court should grant their cross-motion for sanctions against the State Defendants because the State Defendants' motion is frivolous in that the Court already found that Plaintiffs will be irreparably harmed and thus the State Defendants cannot succeed on their motion for a stay given that such motion requires them to show that there would not be significant harm to interested parties if a stay is granted. (*Id.* at 22-24.) Plaintiffs argue that this motion is essentially an effort to force the Court to reconsider its decision to grant the preliminary injunction and that such a tactic has no reasonable good-faith basis in law. (*Id.*) Plaintiffs argue that the Court has the power to grant sanctions despite the 21-day safe harbor provision in Fed. R. Civ. P. 11 because the power to sanction exists independent of court rules and statutes such as Fed. R. Civ. P. 11. (*Id.*)

### 3.     State Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, the State Defendants make four arguments. (Dkt. No. 32 [State Defs.' Reply Mem. of Law].) First, the State Defendants argue that their motion as submitted to this Court is proper, because the authority cited by Plaintiff does not make a stay pending appeal of a preliminary injunction a logical impossibility, and Fed. R. Civ. P. 62(d) specifically allows a court to grant a stay of an injunction when an appeal is pending. (*Id.* at 3-5.) They additionally argue that Fed. R. App. P. 8(a)(1) made it proper for them to seek a stay after the Court's denial of the Order to Show Cause, and that their motion is not a request to reconsider the grant of the injunction but rather a proper motion to stay the injunction pending appeal. (*Id.* at 4-5.)

Second, the State Defendants argue that the Court may properly consider Dr. Howard Zucker's declaration because it was submitted as part of their burden to establish the elements

for a stay pending appeal and it shows that the State Defendants are likely to succeed on their appeal.  (*Id.* at 5.)

Third, the State Defendants argue that there is a high danger of irreparable harm if a stay is denied based on the large number of people attending the wedding (149 of whom have not provided affidavits attesting to their willingness to follow the relevant protocols), the fact that none of the affidavits state that guests will not engage in a host of activities that will increase the risk of the spread of COVID-19, and the fact that evidence showing that the DiMartile-Crawford wedding did not comply with all of the relevant protocols and that the venue has a history of noncompliance with the safety protocols undermines Plaintiffs' evidence that the protocols will be enforced.  (*Id.* at 6-9.)  In support of this last argument, the State Defendants adduce evidence that appears to have been available to them when they filed their motion for a stay.  (Dkt. No. 32, Attach. 1-3.)

Fourth, the State Defendants argue that there is no similarly situated comparator to a 175-person wedding to support Plaintiffs' equal protection claim, discussing why places such as museums, bowling alleys, gyms, civil rights protests, and graduations protests are not comparable.  (Dkt. No. 32, at 9-10.)

### C.     Hearing on August 19, 2020

On August 19, 2020, the Court held a video conference hearing related to the State Defendants' motion.  Arguments were presented by the parties' counsel, but no testimony or additional evidence was adduced.

## II.     GOVERNING LEGAL STANDARD

Rule 62(d) of the Federal Rules of Civil Procedure provides that, "[w]hen an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses,

dissolves, or refuses to dissolve or modify and injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d).  In deciding whether to grant a stay of an order or proceeding pending appeal, courts consider four factors: (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies." *United States v. Grote*, 961 F.3d 105, 122-23 (2d Cir. 2020).  The Second Circuit evaluates these factors on a sliding scale, finding that "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006).  "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff[] will suffer absent the stay.  Simply stated, more of one excuses less of the other." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002).

A stay is not a matter of right but an exercise of judicial discretion that depends on the circumstances of the particular case.  *Niken v. Holder*, 556 U.S. 418, 433 (2009).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Niken*, 556 U.S. at 433-34.

Because the parties have demonstrated in their memoranda of law an adequate understanding of this legal standard, the Court need not, and does not, further elaborate on this legal standard in this Decision and Order, which (again) is intended primarily for the review of the parties.

III.     ANALYSIS

    **A.  The State Defendants' Motion for a Stay Pending Appeal**

    After careful consideration, the Court denies the State Defendants' motion for a stay of the preliminary injunction pending appeal for the reasons stated in Plaintiffs' opposition memorandum of law.  *See, supra*, Part I.B.2. of this Decision and Order.  To those reasons, the Court adds the following analysis.

          **1.   Strong Showing of Likelihood of Success on the Merits**

              **a.   State Defendants' Arguments About Plaintiffs' Claims**

    The Court begins by observing that many of the arguments the State Defendants raise in support of their motion for a stay are merely elaborations on arguments they previously raised in their memorandum in opposition to Plaintiffs' motion for a preliminary injunction or at the hearing related to that motion.  They now submit new evidence in the form of a declaration from New York State Department of Health Commissioner Dr. Howard Zucker (as well as declarations from New York State Beverage Control Investigator Daniel Nevins and New York State Special Operations Unit Investigator Emily Kokotos) in an effort to bolster these arguments.

    The State Defendants' primary argument is that regular dining in a restaurant is not sufficiently comparable to attendance at a wedding because (a) weddings involve more direct interaction between more people than does restaurant dining, (b) weddings last longer than does restaurant dining, (c) indoor gatherings impose a higher risk of transmission of COVID-19 than do outdoor gatherings, (d) gatherings where people raise their voices, sing, or shout increase the risk of transmission of COVID-19, and (e) weddings typically involve many people arriving or leaving at the same time than does restaurant dining.  (Dkt. No. 27, Attach. 6, at 6-7 [State Defs.'

Mem. Of Law].)  The Court notes that many of these bases were already argued by the State

Defendants as part of their opposition to Plaintiffs' motion for a preliminary injunction and

rejected by the Court.  However, because the State Defendants have submitted further evidence

in support of their motion for a stay of the preliminary injunction pending appeal, the Court will

briefly address the State Defendants' arguments on these issues.

As an initial matter, the Court finds that any arguments about indoor gatherings imposing

a greater risk than outdoor gatherings is of little materiality to the analysis here, because, in its

prior Decision and Order, the Court compared an indoor wedding with indoor dining, and thus

any level of risk associated with the respective activities being held indoors is present in both

activities.

In any event, the Court is not persuaded by the State Defendants' argument that the

injunction is undermined by the difference between having discrete smaller groups of people

coming and going in a restaurant as compared with a large group wedding guests staying for

multiple hours.  Rather, logic suggests that putting a rotating group hundreds of different people

in a space over the course of a night would be *more* likely to result in COVID-19 exposure than

having a group of 125 to 175 people in the room for the whole night; with constant turnover of

people in the room, the chance that a carrier of the virus will be present at some point would

appear to increase.  Additionally, the fact that guests will be present at a wedding for longer

periods of time than regular diners does not mean that those guests will be physically interacting

with individuals beyond their assigned table.  It must be remembered that the applicable

protocols require that guests wear a mask and practice social distancing when not seated at their

own table, just as is required in a restaurant setting (and that, here, the venue operator and 24 of

the core attendees at the Giglia-Durolek wedding have sworn that they will comply with those protocols).[1]

Similarly, as will be discussed below, the fact that patrons arrive and leave at the same time for a wedding does not constitute a significant difference from ordinary dining. The State Defendants offer no evidence to suggest that large amounts of people do not arrive at a restaurant at roughly the same time, particularly during peak dining hours. In any event, even if arriving at the same time (whether for a wedding or normal dining), social distancing, face coverings, and other protocols are intended to prevent large groups of people from being in situations where mass transmission of the virus would occur, regardless of whether they are arriving or departing at roughly the same time. Moreover, Dr. Zucker renders only a conclusory opinion that arriving at and leaving a restaurant at the same time greatly increases the probability of transmission of the COVID-19 virus.[2]

The State Defendants also argue that weddings and dining are not sufficiently comparable because there is a greater risk that guests at a wedding will not follow social distancing protocols because guests at a wedding are present for the specific purpose of mingling with other guests, a

---

[1]     The Court notes that its conclusions about the comparative safety of the Arrowhead's Sterling venue are only strengthened by the fact that the venue has a 35-foot high-peak ceiling, a HEPA filtration system, and two floors of 8- or 6-person tables spread out across 10,000-square-feet of space that is ordinarily meant to accommodate 438 diners. (James Decl., at ¶ 3 and Exh. C.) The Court notes further that nowhere in his declaration does Dr. Zucker account for the fact that, here, the 175 attendees at the Giglia-Durolek wedding (each of whom will have had his or her temperature checked before entering the venue) would be less than 40-percent of the 438 strangers who would be authorized to (without temperature checks) dine at the venue over the same four or five hour period under the Governor's restriction on dining indoor at restaurants.

[2]     More specifically, Dr. Zucker opines in his declaration that wedding attendees "arrive and leave at roughly the same time," which "greatly increase[s] the probability of transmission of the COVID-19 virus" for reasons "more fully set below." (Dkt. No. 27, Attach. 3, at ¶ 7 [Zucker Decl.].) However, he never sets forth those reasons, but merely restates his opinion, rendering that opinion conclusory. (*See, e.g.*, *id.*, at ¶ 12.d.)

motivation that is not present in an ordinary dining situation.  (Dkt. No. 27, Attach. 6, at 7-8 [State Defs.' Mem. of Law].)  For the sake of argument, the Court will not linger on whether members of a local community who have encountered each other for the first time after a long quarantine have less of an incentive to mingle than do family members weary of infecting their loved ones.  More important is that, regardless of what purpose visitors to the venues have, the Court's preliminary injunction subjects those visitors to the same rules and protocols.

Although the State Defendants argue that there is no evidence that all guests at  the Giglia-Durolek wedding would comply with social distancing, use of face coverings, or other safety requirements, there is some such evidence: as the Court has previously stated, here, the venue operator and 24 of the core attendees at the Giglia-Durolek wedding have sworn that they will comply with those requirements.  Moreover, the State Defendants have not provided any evidence that any of the remaining guests at the Giglia-Durolek will nonetheless flout these requirements.  If accepted, the State Defendants' argument would allow the State to justify almost any restriction on a person's ability to gather as long as COVID-19 remains a threat due to the inability to predict human behavior with certainty; and yet, the Governor has allowed many businesses to operate and gatherings to take place precisely on the assumption that patrons and guests will comply with the relevant restrictions.[3]

---

[3]    The Court also notes that the Governor recently announced that schools in the State of New York will be permitted to open in less than month.  Additionally, Plaintiffs' submission of evidence reveals that other indoor activities are being allowed at a percentage-capacity that might exceed the 50-person gathering restriction, including museums at 25-percent capacity and bowling alleys at 50-percent capacity.  (Dkt. No. 31, Attach. 4, at ¶¶ 21-26 [Delgado Decl.].)  Furthermore, gyms and fitness centers will be permitted to open at a third of their capacity as of August 24, 2020, two days after the Giglia-Dorolek wedding is scheduled to take place.  Michael Gold & Luis Ferré-Sadurní, *N.Y. Gyms and Fitness Studios Can Reopen as Soon as Aug. 24, Cuomo Says*, N.Y. Times, (Aug. 17, 2020), https://www.nytimes.com/2020/08/17/nyregion/nyc-gyms-reopening.html.

It warrants emphasizing that the assumption that people will "mingle" with each other at a wedding does not itself lead to an assumption that those people will also not engage in safe practices such as social distancing and/or mask-wearing while engaging in that mingling. Furthermore, the State Defendants' citation to evidence that one-third of Americans nationwide do not wear masks and that a "significant minority" of New Yorkers do not consistently follow social distancing protocols are not sufficient to even plausibly suggest that the guests at the Giglia-Durolek wedding will flout the required protocols.[4]  Contrary to the picture that Dr. Zucker and the State Defendants have tried to paint on this issue, the evidence relied on by Dr. Zucker states that "[a]n overwhelming number of New Yorkers are adhering to public health recommendations including social distancing, hand washing and wearing a mask at least as much as they can if not completely."[5]  In light of such evidence, the State Defendants' speculation that wedding guests would not comply with social distancing or face covering requirements is insufficient to undermine the Court's rationale for granting the preliminary injunction.

The Court is also not convinced by the State Defendants' argument that, because the venue where Plaintiffs' weddings are being held is not a party to this lawsuit, it would have no self-interest or motivation to ensure that protocols are enforced during the weddings.  To the

---

[4]     The Court notes that there are still many states that do not have mandates requiring the wearing of masks in public places, and that the fact that a minority of New Yorkers do not always social distance does not suggest that the guests at the Giglia-Durolek wedding (a) are part of that minority, or (b) would not practice social distancing around their family and friends at a wedding.

[5]     (Dkt. No. 27, Attach. 3, at ¶ 16 n.5 [Zucker Decl.] [stating that 73-percent of people surveyed always wear a mask when social distancing is not possible and an additional 17-percent wear a mask as much as they can, for a total of 90-percent of people surveyed are typically wearing a mask in relevant situations, while 56-percent completely adhere to social distancing requirements and 36-percent social distance as much as they can, for a total of 92-percent of people surveyed practicing social distancing].)

contrary, the venue in question has received a cease-and-desist letter from the New York State

Department of Health due to a previous instance in which it was found to be holding a gathering

of approximately 150 individuals who were not wearing face coverings not related to this

lawsuit.  (Dkt. No. 27, Attachs. 4 and 5 [Bass Decl.].)  Given that it is clear that the venue would

be liable for enforcing (and subject to penalties if they fail to enforce) the relevant restrictions

imposed by New York State regardless of any preliminary injunction by the Court, the Court

cannot say that the venue owner in question will have no incentive to ensure that protocols are

complied with particularly during Plaintiffs' weddings.

Additionally, the Court finds that the State Defendants' evidence of past violations of the

50-person gathering restriction and other protocols at the venue in question does not change this

finding.[6]  Although the State Defendants submit evidence of complaints received about the

venue's failure to comply with COVID-19 gathering limitations and other restrictions since July

5, 2020, it appears that no punitive action was taken against the venue until August 5, 2020 (six

days after Plaintiffs filed this action), when the New York State Department of Health issued a

cease-and-desist order against the venue related to having gatherings of more than 50

individuals, after which the venue's liquor license was suspended on August 6, 2020.  (Dkt. No.

---

[6]     The Court also notes that, although the evidence adduced by the State Defendants in their
reply was likely available at the time the State Defendants filed their motion for a stay, they
waited until their reply memorandum to submit it.  For these reasons, the Court may, and does,
disregard that evidence (including the video of the DiMartile-Crawford wedding ceremony),
particularly because Plaintiffs also have not had a fair and adequate opportunity to respond to
that evidence due to the timing of its submission.  *See, e.g., Compania Del Bajo Caroni Caroni,
C.A. v. Bolivarian Republic of Venezuela*, 341 F. App'x 722, 724 (2d Cir. 2009) (summary order)
("A district court enjoys broad discretion . . . to rely [or not rely] on evidence submitted with the
reply papers[.]"); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n. 7 (S.D.N.Y.1997)
("Arguments made for the first time in a reply brief need not be considered by a court.").  For the
sake of thoroughness, however, the Court will, in the alternative, consider the evidence.

32, Attach. 2, at 2-4, 36-41.)  The State Defendants have not provided any evidence that this enforcement action would not cause the venue owner to be more careful in ensuring that protocols are followed.[7]  To the contrary, Plaintiffs submitted an unrebutted declaration from Lucas James, co-owner of the venue at which the upcoming wedding will be held, in which Mr. James states the following: (a) he was present for part of the August 7, 2020, wedding of Plaintiffs DiMartile and Crawford; (b) neither he nor his staff observed any violations of the applicable public safety restrictions; (c) he observed a small number of guests from another wedding walking to a car in the parking lot to potentially consume alcohol, causing staff to confront the guests and advise them they could not consume alcohol in the parking lot, an order with which the guests complied; (d) a small number of guests (not from the DiMartile-Crawford wedding) engaged in lawn games outside; (e) he did not observe any such behavior from guests at the DiMartile-Crawford wedding; (f) staff moved two tables that were not being used for the DiMartile-Crawford wedding because inspectors from the Erie County Department of Health and Erie County Sheriff's Office deemed them to be too close together; (g) guests at the DiMartile-Crawford wedding wore masks when required, socially distanced, remained seated for speeches, did not dance, and comported themselves in accordance with the restrictions; (h) based on his personal observation and reports from his staff who were present, all protocols were followed; and (i) he makes assurances that he and his staff will make their best efforts to ensure that there will be no violations at the Giglia-Durolek wedding.  (Dkt. No. 31, Attach 3 [James Decl.].)

---

[7]      Moreover, the Court notes that the July 3 and August 1 misconduct at Arrowhead mainly involved liquor-sales and dancing, both of which have already been prohibited at the Giglia-Durolek wedding.  Additionally, other notations of violations were heavily based on exceeding the 50-person gathering restriction, a factor that is not at issue here because the Court has already found, by granting the preliminary injunction, that the 50-person gathering restriction does not apply to the Giglia-Durolek wedding.

This declaration indeed shows, contrary to the State Defendants' argument, that Mr. James has in fact made greater efforts to ensure that protocols are being complied with.  Additionally, Attorney Parker for the County Defendants stated at the hearing that a report made by County representatives who had inspected the venue that night did not note any compliance violations related to the DiMartile-Crawford wedding.

Moreover, as the Court has previously stated, Plaintiffs have submitted declarations from Plaintiffs Giglia and Durolek, and their parents, Albert Giglia, Lynn Giglia, James Durolek and Rose Durolek, in which they all certify that they will follow (and ensure that guests follow) all safety and social distancing protocols during the remaining wedding.  (Dkt. No. 31, Attach. 2, at 2-12.)  Plaintiffs have also submitted declarations from 17 other members of Plaintiffs Giglia and Durolek's immediate family, who have all sworn that, at the wedding, they will neither violate nor tolerate the violation of the Governor's restrictions related to indoor dining.  (Dkt. No. 31, Attach. 2, at 14-30.)  All of this evidence directly contradicts the State Defendants' assertions that it is highly unlikely that guests will comply with the required safety protocols if the next wedding is allowed to proceed.

The State Defendants submitted further evidence along with their reply memorandum of law related to the likelihood of compliance with the dining protocols, including declarations and a video of the DiMartile-Crawford wedding ceremony.  However, this evidence does not persuasively show that there were flagrant violations of protocol at the DiMartile-Crawford wedding, or suggest that there will be violations at the Giglia-Durolek wedding.  First, the Court notes that the only evidence the State Defendants have provided related to the DiMartile-Crawford wedding was about the marriage ceremony; they have provided no evidence to contradict Plaintiffs' evidence related to any other part of that wedding, including the reception.

Second, although the video of the ceremony shows a few instances of individuals being close to one another without masks, the State Defendants have not provided any evidence about the relationships between those individuals (i.e., whether they are family, or whether they reside in the same household).  Additionally, although the video shows rows of empty chairs where the guests had been seated previously, it does not show guests seated, and thus there is no evidence as to whether guests were actually seated shoulder-to-shoulder (or whether there were chairs left between individuals from different households), or as to whether guests were wearing masks while seated.  On the whole, the evidence provided by the State Defendants does not persuasively support the State Defendants' implication that flagrant and dangerous violations of safety protocols occurred at the DiMartile-Crawford wedding that would undermine the declarations by the parties, guests, and venue owner about their commitment to ensuring that protocols are followed at the Giglia-Durolek wedding.

The State Defendants also do not suggest how any issues of noncompliance at the DiMartile-Crawford wedding (or at a wedding setting in general) would not have occurred had the wedding been limited to 50 people.  Certainly, generally, a larger number of people would increase the chances that a person testing positive for COVID-19 might be present, but the number present says nothing about the likelihood that people will comply with the health and safety protocols; and yet, the Governor allows weddings of 50 people or less without requiring explicit evidence that those groups will comply with all mandated health and safety restrictions. The State Defendants' counsel argued at the hearing that the 50-person limitation was the result of a judgment call based on all the available data and that allowing a greater number of people for some activities (i.e., 50-percent capacity for restaurant dining) is due to an analysis of industry-specific factors that simply do not translate to the setting of a wedding.  However, the

State Defendants did not provide the Court with evidence of this industry-specific analysis in support of their argument.  For all the reasons already discussed, the Court is not persuaded that there is a rational basis for refusing to apply the restaurant-specific restrictions to the weddings here.

Lastly, even though Dr. Zucker states now that he has been made aware of fifteen clusters of COVID-19 within the past few weeks related to indoor dining, New York State continues to allow dining with the same restrictions.  Dr. Zucker also does not provide any information indicating that these "clusters" were anything more than discrete instances of transmission that were identified and contained through other protocols such as the New York State's track-and-trace system.  Indeed, as George Delgado, M.D., states in a declaration submitted by Plaintiffs, contact tracing is perhaps easier for a wedding than for normal dining because the identities of all guests present at the event are known and easily traceable should an infection be discovered. (Dkt. No. 31, Attach. 4, at ¶ 16 [Delgado Decl.].)  Dr. Zucker in particular has not provided any information to suggest that these clusters have seriously threatened New York State's public health goals or resulted in significant spread of COVID-19; again, the fact that restaurant dining is still permitted and has not been limited by additional restrictions seems to suggest that is not the case.  Nor has the Court been provided any information as to whether these clusters occurred in situations where all safety protocols were being followed or if they were the result of violations of those protocols.

Based on the above, the Court finds that the State Defendants have not made a strong showing that they are likely to succeed on the merits of their arguments.

### b.  State Defendants' Arguments About Procedural Error

In addition to their arguments about the merits of Plaintiffs' substantive equal protection claim, the State Defendants also now assert that the Court erred in applying the normal preliminary injunction standard rather than the heightened standard because, in granting the injunction, the Court essentially granted Plaintiffs all the relief that they are requesting (i.e., the ability to have their weddings with more than 50 people) and such relief cannot be rescinded if the State Defendants ultimately succeed in this lawsuit.

A movant is held to a heightened standard where "(i) an injunction is 'mandatory,' or (ii) the injunction 'will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 [2d Cir. 1995]). "When either condition is met, the movant must show a 'clear' or 'substantial' likelihood of success on the merits, . . . and make a 'strong showing' of irreparable harm, . . . in addition to showing that the preliminary injunction is in the public interest." *Actavis PLC*, 787 F.3d at 650 (internal citations omitted).

The Court agrees with the State Defendants that the heightened standard applied to Plaintiffs' motion for preliminary injunction. However, the Court's failure to expressly include words like "substantial" likelihood of success and "strong" showing of irreparable harm in the analysis section of its Decision and Order does not somehow invalidate its preliminary injunction because its Decision and Order granting that preliminary injunction nonetheless shows that Plaintiffs have met this higher standard.

First, the reasons provided in the Order of August 7, 2020, indicate that Plaintiffs have shown a substantial likelihood of success on the merits of their equal protection claim. Specifically, the Court emphasized the similarities between use of a facility for indoor dining and

use of the same facility for an indoor wedding in determining that Plaintiffs showed a likelihood

of success on the merits of their equal protection claim based on the two very different gathering

restrictions imposed on each use.  (Dkt. No. 20, at 21-24 [Decision and Order filed Aug. 7,

2020].)  These similarities, as well as the clear difference in treatment without any rational

explanation, are sufficient to constitute a showing of a substantial likelihood of success on the

merits.

        Second, Plaintiffs have also made a sufficiently strong showing of irreparable harm to

meet even the heightened standard.  As to the State Defendants' argument that the Court did not

discuss why a finding of irreparable harm was appropriate in the Decision and Order of August

7, 2020, the Court clarifies (as it discusses further in this Decision and Order) that, because the

irreparable harm primarily arises from the fact of an alleged violation of Plaintiffs' constitutional

rights, the Court's discussion of the likelihood of success on that claim (which the Court found to

be significant enough to merit a preliminary injunction) provided the justification for that

finding.  (Dkt. No. 27, Attach. 6, at 9 [State Defs.' Mem. Of Law].)  In particular, because the

deprivation of a constitutional right is itself the main harm, the likelihood of success on the

constitutional claim is inextricably intertwined with whether irreparable harm exists.  *See Sajous*

*v. Decker,* 18-CV-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) (finding that

petitioner had made an adequately strong showing that he would suffer irreparable harm absent a

preliminary injunction because he had demonstrated a substantial likelihood of success on the

merits of his Due Process Clause claim for deprivation of liberty due to unlawful detention);

*Donohue v. Mangano*, 886 F. Supp. 2d 126, 151-52 (E.D.N.Y. 2012) (noting that, in certain

cases where the loss of constitutional rights constitutes the harm, "the imminent harm inquiry

merges with the likelihood of success analysis," such that "[t]he likelihood of success on this

19

constitutional deprivation is so great that irreparable harm is inevitably shown"). The Court

therefore finds no merit in the State Defendants' argument that the Court failed to explain the

basis of its irreparable harm finding.

As to the State Defendants' argument that relying on a "presumption" of irreparable harm

was insufficient, "it is well-settled that an alleged constitutional violation constitutes irreparable

harm." *Basank v. Decker*, 20-CV-2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020)

(collecting cases); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("The district court

therefore properly relied on the presumption of irreparable injury that flows from a violation of

constitutional rights."); *In re Gorsoan Ltd.*, 18-MC-0431, 2020 WL 4194822, at *7 (S.D.N.Y.

July 21, 2020) ("When an alleged deprivation of a constitutional right is involved, most courts

hold that no further showing of irreparable injury is necessary.") (quoting 11 C. Wright & A.

Miller, *Federal Practice and Procedure*, § 2948, at 440 [1973]). Thus, whether the Court termed

its finding "presumptive" or not, the legal authority makes clear that irreparable harm can be

appropriately established through the existence of allegations of a constitutional violation.

This showing of irreparable harm is elevated to a strong showing here based on both (a)

the concurrent showing of a substantial likelihood of success on the merits (as discussed above),

and (b) Plaintiffs' allegations and evidence that they would suffer other imminent harms in the

absence of an injunction that could not be remedied by ultimate success in this lawsuit. *See Yang

v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (finding plaintiffs had made a strong showing of

irreparable harm because, "[b]eyond alleging the violation of their constitutional rights, there can

be no question that Plaintiffs and the Sanders delegates have demonstrated that, without the

requested injunctive relief reversing the effects of the April 27 Resolution, they could neither

compete nor participate in New York's Democratic presidential primary"); *Jolly,* 76 F.3d at 473-

74, 482 (finding that the heightened standard for preliminary injunctions applied, and affirming that plaintiffs had adequately shown irreparable harm by showing a substantial likelihood of success on that constitutional claim, as well as providing evidence that he suffered physical effects of his confinement, "each [of which] serve as an independent basis for the district court's conclusion that the plaintiff would suffer irreparable harm in the absence of preliminary injunctive relief"); *Upstate Jobs Party v. Kosinski*, 18-CV-0459, 2018 WL 10436253, at *3, 7 (N.D.N.Y. May 22, 2018) (Suddaby, C.J.) (finding that plaintiffs had made a strong showing of irreparable harm where they alleged a violation of their First Amendment rights and produced evidence of how defendants' actions would hinder their actions during the nominating petition period and would deprive them of the ability to contribute certain money to the UJP); *V.W. by and through Williams v. Conway*, 236 F. Supp. 3d 554, 588-89 (N.D.N.Y. 2017) (Hurd, J.) (finding a strong showing of irreparable harm where [a] plaintiffs alleged a deprivation of constitutional rights, and [b] submitted evidence that continuing use of solitary confinement on juveniles put them at serious risk of psychological damage and deprivation of education services); *Sajous*, 2018 WL 2357266, at *13 (finding that a substantial likelihood of success on the merits of a claim alleging violation of the plaintiff's due process rights related to an unlawful detention was sufficient to make a strong showing of irreparable harm).

For example, Plaintiffs have made a showing that, in the absence of an injunction, they would be required to either (a) have their scheduled weddings without certain guests that they allege are integral to the validity of their marriages according to their Christian or Catholic beliefs, or (b) postpone their weddings until an uncertain time when larger gatherings are permitted (either by order of the Governor or by a favorable decision on their lawsuit), which would deprive them of time as a married couple, among other things. These harms, combined

with the substantial likelihood of success on their equal protection claim, constitute a sufficiently strong showing of irreparable harm to sustain the issuance of the preliminary injunction.

Based on the above, the Court finds that, whether or not it framed its findings in the terminology of the heightened standard for granting a preliminary injunction, the allegations, the evidence, and the Court's findings all support a conclusion that Plaintiffs have met that heightened standard. A stay is therefore not warranted because, despite the State Defendants' arguments to the contrary, they have not made a strong showing that they are likely to succeed on the merits of this claim on appeal.

### 2. Danger of Irreparable Injury to State Defendants if the Stay Is Denied

In support of this factor, the State Defendants essentially argue that allowing Plaintiffs' weddings to proceed under the terms of the preliminary injunction would pose an unreasonable risk of a cluster of new COVID-19 infections. (Dkt. No. 27, Attach. 6, at 10-12 [State Defs.' Mem. of Law].) However, the Court does not find these arguments persuasive. As already discussed above, the State Defendants have not demonstrated how weddings conducted using the same restrictions and precautions applicable to indoor dining would pose a significantly greater danger to public health and safety than conduct that the Governor already permits. Although the Court certainly recognizes that COVID-19 remains a significant public health concern that requires careful monitoring, the mere speculative threat of increased infections is not sufficient to show a danger of irreparable injury without a consideration of the individualized circumstances of the relevant gathering or activity.

The State Defendants' citation to gatherings in New Rochelle, New York, and Arkansas that occurred in February and March as evidence that Plaintiffs' weddings would pose an unreasonable risk of becoming "super-spreader" events is also not persuasive. Both of these

events occurred before the implementation of social distancing and other public health and safety measures, including the use of masks when in public.  As made clear in the Order of August 7, 2020, Plaintiffs' weddings will be subject to a host of precautionary measures: for example, they are permitted to have only an amount of people that complies with the 50-percent occupancy restriction imposed by New York State on restaurants, individuals must wear masks when not at their tables, tables must be spaced apart, and no dancing will be permitted.  (Dkt. No. 20, at 24-25 [Decision and Order filed Aug. 7, 2020].)  Plaintiffs' weddings are explicitly subject to all the restrictions that New York State has deemed acceptable for allowing restaurants to operate.  As a result, the Court cannot say that Defendants have shown that allowing Plaintiffs' weddings to proceed in the manner specified by the preliminary injunction would pose the same risk of being a "super-spreader" event as these past examples that they specifically cite.

### 3.   Substantial Harm to Other Interested Parties

The Court rejects the State Defendants' argument that there would be no injury to Plaintiffs Giglia and Durolek if the injunction is stayed.  To make such a finding would directly contradict the Court's previous finding that Plaintiffs have made a strong showing of irreparable harm.  As the Second Circuit has noted, "the grant of a stay of a preliminary injunction pending appeal will almost always be logically inconsistent with a prior finding of irreparable harm that is imminent as required to sustain the same preliminary injunction."  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1999) ("[W]here the order stayed involves a preliminary injunction, a principle element of which is a finding of irreparable harm that is imminent, it is logically inconsistent, and in fact a fatal flaw, to subsequently find no irreparable nor even serious harm to the Plaintiffs pending appeal."); *Rodriguez v. City of New York*, 197 F.3d 611, 614 (2d Cir. 1999) (finding that the granting of a stay of a preliminary injunction

pending appeal negated the district court's initial finding on the preliminary injunction motion that the plaintiffs would suffer imminent irreparable harm).  The State Defendants' argument that Plaintiffs Giglia and Durolek would not be harmed because they could simply have a smaller wedding or use videoconferencing completely ignores the core allegations of harm underlying Plaintiffs' Complaint (i.e., that Plaintiffs' inability to have a gathering as large as would be allowed under normal dining conditions at the same venue violates their constitutional rights). Although the State Defendants' interest in preventing the spread of COVID-19 is certainly compelling, it is troubling to this Court that the State Defendants would assert that violations of rights guaranteed by the Constitution would not constitute a substantial harm.  Because the Court remains convinced of the propriety of its finding that Plaintiffs will suffer imminent irreparable harm in the absence of the injunction (particularly under the circumstances in this case, where granting a stay would effectively cut by more than two-thirds the size of the Giglia-Durolek wedding that is scheduled to take place on August 22), it cannot find that Plaintiffs Giglia and Durolek would not suffer harm as a result of a stay.

### 4.  Public Interest

Lastly, the Court finds that the public interest does not tip the analysis in the State Defendants' favor.  Although the public certainly does have an interest in preventing the spread of COVID-19, the public also has an interest in having constitutional rights protected and not unduly infringed by unchecked government action.  Because of the delicate balance of interests in this situation, the Court cannot say that the State Defendants have shown that their asserted interest is so significantly greater than Plaintiffs' interests in protecting their constitutional rights such that the balance of the public interest would tip decidedly in their favor.

### B.  Plaintiffs' Motion for Sanctions

After careful consideration, the Court finds that sanctions are not warranted for the following reasons.

The Court finds, as an initial matter, that sanctions are not procedurally appropriate under Fed. R. Civ. P. 11 because the State Defendants have not been afforded 21 days to withdraw or correct their motion as required by the Rule's safe-harbor provision.  Fed. R. Civ. P. 11(c)(2). *See Star Mark Mgmt, Inc. v. Koon Chun Hing Kee Soy & Sauce Factory,* 682 F.3d 170, 175 (2d Cir. 2012) (noting that "[t]he safe-harbor provision is a strict procedural requirement," and that "[a]n informal warning in the form of a letter without service of a separate Rule 11 motion is not sufficient to trigger the 21-day safe harbor period").

Plaintiffs argue that, in the alternative, the Court may exercise its inherent power to impose sanctions regardless of whether Fed. R. Civ. P. 11 applies.  It is true that "[t]he court has inherent power to sanction parties and their attorneys, a power born of practical necessity that courts be able 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Gissendaner v. Credit Corp. Solutions, Inc.*, 358 F. Supp. 3d 213, 223 (W.D.N.Y. 2019) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 [2d Cir. 2000]). "Sanctions under the court's inherent power are appropriate when a party 'has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Gissendaner*, 358 F. Supp. 3d at 223 (quoting *Walker v. Smith*, 277 F. Supp. 2d 297, 301 [S.D.N.Y. 2003]; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 [1991]).  More specifically, sanctions under a court's inherent power "are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes."  *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009).  "Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the

25

reasonable beliefs of the attorney whose conduct is at issue." *Wolters Kluwer Fin. Servs.*, 564 F.3d at 114. "A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Id.*

The Court finds that, although Plaintiffs are correct that a stay is in most cases inconsistent with the granting of a preliminary injunction, the Second Circuit has recognized that such a motion would not be inconsistent in all cases. In particular, the Second Circuit qualified its decision in *Rodriguez ex rel. Rodriguez* by stating that "[n]othing in this opinion should be taken to in any way inhibit a district court from granting a brief stay of a preliminary injunction in an appropriate case in order to permit the Court of Appeals an opportunity to consider an application for a stay pending an expedited appeal," with the purpose to "give the appellate court an opportunity to decide whether an additional stay and an expedited appeal should be granted." *Rodriguez ex rel. Rodriguez*, 175 F.3d at 235-36. Although not quite stated in such terms, the State Defendants' motion for a stay before this Court, combined with their concurrent motion for a stay and appeal before the Second Circuit, seems to be doing precisely what the Second Circuit has stated is permitted. Additionally, the Court's research has shown a multitude of examples of cases in which a party sought a stay of an injunction pending appeal, and thus the Court is not convinced that such practice is inherently without legal basis in a general sense. The fact that an argument may not be supported or ultimately unsuccessful does not make that argument legally baseless in the sense that it is sanctionable conduct taken in bad faith. Additionally, apart from generic assumptions about the State Defendants' intentions and motives, Plaintiff has not provided any showing that the State Defendants' conduct was in bad faith. As a result, the Court finds that the State Defendants' motion for a stay does not suggest that sanctions are warranted.

The Court also recognizes that, as a result of Fed. R. App. P. 8, the State Defendants were required to file a motion for a stay in this Court before filing any such motion with the Second Circuit unless it could show that "moving first in the district court would be impracticable." Fed. R. App. P. 8(a)(1), (a)(2)(A)(i). The State Defendants have attempted to make such an argument in its submission to the Second Circuit, which was filed on August 14, 2020, approximately two days after it filed the current motion in this Court. (Dkt. No. 31, Attach. 2, at 39-68.) Although Plaintiffs argue that filing the motion with both courts is "dilatory motion practice," the Court does not agree under the circumstances here.[8] The time limit in this case is understandably short, given that the remaining wedding is scheduled to take place on August 22, 2020. The State Defendants were thus in the unenviable position of having to choose between either (a) filing a motion with this Court to comply with Fed. R. App. P. 8 knowing that they might not have time to file a motion with the Second Circuit before the upcoming wedding upon receiving this Court's decision, or (b) filing a motion with the Second Circuit in the first instance without knowing whether the Second Circuit will agree with them that obtaining a ruling from this Court was not practicable. Thus, in this situation, the Court finds that the State Defendants' filing of concurrent motions for a stay of the preliminary injunction does not represent bad faith, vexatious, wanton, or oppressive conduct that would warrant the imposition of sanctions (although the Court expresses disappointment in defense counsel's continued pursuit of an impracticability argument despite her knowledge, by 10:00 a.m. on Monday, August 17, that the

---

[8] The Court notes that the Fifth Circuit recently addressed a similar situation where a defendant pursued simultaneous motions for a stay before both the district court and the circuit court. *Marlow v. LeBlanc*, 810 F. App'x 302, 303-04 (5th Cir. 2020). Although highlighting that the district court had not yet ruled on the defendant's motion, the Fifth Circuit did not chastise the defendant for pursuing identical motions in both courts simultaneously. *Marlow*, 810 F. App'x at 302-04.

Court would hold at hearing at 10:30 a.m. on Wednesday, August 19, and that the Court took just over 3.5 hours to issue a 25-page written decision after its completion of the last hearing on Friday, August 7).

For all of the above reasons, the Court denies Plaintiffs' cross-motion for sanctions.

Finally, the Court finds it necessary to emphasize that its preliminary injunction was expressly limited to these Plaintiffs, who have (along with the venue operator) adduced unrebutted evidence that they will comply with the restrictions governing indoor dining at this particular venue at these particular times. Although Plaintiffs Giglia and Durolek (in addition to 21 attendees, the officiant and venue operator) have sworn to follow Defendants' indoor dining restrictions at restaurants, the State Defendants have continued to assume noncompliance based the nature of the event as a wedding, without a rational basis.

**ACCORDINGLY**, it is

**ORDERED** that the State Defendants' motion for a stay of the preliminary injunction order pending appeal (Dkt. No. 27) is **DENIED**; and it is further

**ORDERED** that Plaintiffs' cross-motion for sanctions (Dkt. No. 31) is **DENIED**.

Dated: August 19, 2020
       Syracuse, New York

Glenn T. Suddaby
Chief U.S. District Judge